**Ron GILVIN, Appellant,**

v.

**Edward FIRE, Individually and as President of the International Union of Electronic, Electrical Salaried, Machine and Furniture Workers, et al., Appellees.**

No. 00–7221.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 15, 2001.

Decided Aug. 21, 2001.

James F. Wallington argued the cause and filed the brief for appellant.

Thomas M. Kennedy argued the cause for appellee. With him on the brief was Peter Mitchell.

Before: HENDERSON, TATEL, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Ron Gilvin challenges his suspension and subsequent removal from the office of Secretary–Treasurer of the International Union of Electronic, Electrical, Salaried, Machine and Furniture Workers, AFL–CIO (IUE). Gilvin asserts that the IUE, the IUE's President, and members of the IUE's Executive Board violated federal labor law and the IUE's constitution by suspending and removing him in retalia-

tion for protected speech and participation in a civil trial. The district court dismissed part of Gilvin's lawsuit for failing to state a claim, and granted summary judgment against the remainder. We affirm in part and reverse in part.

## I

In November 1996, the IUE elected defendant Edward Fire to the office of IUE President and elected plaintiff Gilvin, Fire's political opponent, to be Secretary–Treasurer. Both took their posts in January 1997 and were scheduled to serve until December 31, 2000. On June 10, 1998, however, the IUE Executive Board suspended Gilvin with pay. And on August 26, 1998, the IUE's Trustees certified petitions from two local unions seeking Gilvin's recall from office. Gilvin lost a recall election on October 9, 1998, and was removed as IUE Secretary–Treasurer.

Gilvin and Fire came into conflict soon after their 1996 election.[1] In April 1997, Fire, backed by the Executive Board, proposed transferring money from the IUE's Strike Insurance Fund to its General Fund in order to reduce the union's operating deficit. Gilvin opposed the proposal on the ground that it would weaken the Strike Fund and conceal the union's failure to maintain a balanced budget. Gilvin expressed that opposition in letters to IUE local union presidents and members, which characterized the proposal as a "raid" on the Strike Fund, J.A. 1161, "a *reckless* change in the financial structure of our Union," *id.* at 1163, and an effort to grant Fire "dictatorial powers," *id.* at 1161. The IUE membership eventually adopted Fire's proposal. Thereafter, at an Executive Board meeting on April 21, 1997, defendant Board members made clear, in no uncertain terms, their displeasure with Gil-

---

1. Because Gilvin's complaint was dismissed pursuant to Federal Rules of Civil Procedure 12(b)(6) and 56, the following description of the facts draws all reasonable inferences in Gilvin's favor. *See infra* Part III.

vin's efforts to oppose the Strike Fund plan.[2]

In May 1997, Gilvin began questioning increases in IUE subsidies to IUE District Councils, as well as raises and travel reimbursements approved by President Fire. Gilvin charged that checks for those expenditures were issued without his knowledge or approval. Article VII(C) of the IUE constitution requires that "[a]ll checks of the Union must bear the signatures of the President and the Secretary–Treasurer," and Gilvin had previously authorized the union's comptroller to utilize a facsimile of his signature on IUE checks. In August 1997, Gilvin wrote Fire and the comptroller revoking that authorization, "[i]n order to assure that no funds of the International are disbursed for other than legitimate purposes and with adequate substantiation." *Id.* at 1175. Gilvin explained his decision in a letter to the Executive Board and local unions dated September 10, 1997. Calling the raises and travel expenditures a "raid on the International treasury," *id.* at 1183, he wrote:

> I will not sign any check until I can verify that all International expenditures are properly authorized and substantiated.... I consider it my Constitutional responsibility as Secretary–Treasurer to

provide a vigilant, meaningful financial oversight on behalf of the IUE membership, and I won't be bullied into doing less!

*Id.* at 1184 (emphasis omitted).

Fire responded with his own letter to the members of the IUE. He wrote that Gilvin "always has had the ability and always was expected to see to it that expenditures are made under proper accounting procedures and have proper documentation," acknowledging that "[t]hose are the basic responsibilities of the Secretary–Treasurer." But Fire declared that "if he refuses to sign a check, there will be a serious constitutional problem." *Id.* at 1189. Fire also wrote that for "Gilvin to continue to characterize the [Strike Fund] plan as a 'raid' on the ... Fund is an insult to our members and our leadership." *Id.* at 1191. On October 15, 1997, Gilvin reauthorized the use of his facsimile signature, with the understanding that the IUE's comptroller would provide him with a daily register of all checks and with supplemental documentation upon request. *Id.* at 1199. On November 13, 1997, the Executive Board held a meeting at which several members again sharply decried Gilvin's letters, and suggested that something had to be done to stop him from issuing more.[3]

---

**2.** *See, e.g.,* J.A. 1375 ("[T]here are letters all over my District really taking on what we did. I think that's g*dd**ned outrageous...."); *id.* at 1376 ("I hope to h*ll we don't have to see any more of these disruptive letters in this International Union."); *id.* at 1378 ("I was appalled at that letter. I think it does nothing but disrupt this International Union and the goals that we're trying to achieve."); *id.* ("I also don't appreciate the officers ... out there with the staff at the locals, undercutting this Board. That's been happening in my district and I want it to stop."); *id.* at 1339 ("The way this thing came down I think was bull c**p.... I resented the h*ll out of that [letter] being at the district meeting."); *id.* at 1410 (describing Gilvin's letter as "garbage trash—that goes out to our membership and

to the leadership ... to denounce our President," and charging that Gilvin "took the credibility of the Executive Board and knifed us"); *id.* at 1417–18 ("If anybody has any problems with the leadership of this union ... these things have to be dealt with behind closed doors. It should not be made public.").

**3.** *See, e.g.,* J.A. 1448 ("[T]he whole problem lies there with the rumor mongers, with the letters going out ... that's the bone of contention."); *id.* at 1449 ("[T]he man's got to be censured.... We can't put up with this garbage any more."); *id.* at 1460–61 ("I'm not going to take any more s**t, right in the area that I live, from him and his constituents.... [I]f it doesn't stop, then I don't have a prob-

In December 1997, Gilvin wrote an anonymous letter to the "Hoekstra Committee," a Congressional subcommittee chaired by Representative Peter Hoekstra that was investigating allegations of union corruption. Gilvin's letter alleged that three IUE checks, totaling $163,135.98, had been issued without an identifiable union purpose. Complaint ¶¶ 48, 49. Gilvin did not inform anyone at the IUE that he had sent the letter. J.A. 449–62.

On January 5, 1998, Gilvin was present at the United States District Court for the Southern District of Ohio, during the trial of a lawsuit brought against the IUE by Gilvin's home local, IUE Local 801. Fire and other IUE officials saw Gilvin in the courtroom. Several weeks later, Fire sent Gilvin a memorandum asking him to explain why his weekly attendance record reported that he was away from the office that day on "Union Business." *Id.* at 1208. In a one-sentence written reply, Gilvin responded that he had been subpoenaed. *Id.* at 1210. At the next Executive Board meeting, held on March 10, 1998, Gilvin was attacked by defendant Board members who interpreted his appearance in the courthouse as reflecting a willingness to testify against the IUE.[4]

On April 26, 1998, Gilvin sent a letter to an IUE member, opposing a proposed division of Local 801 into two separate locals. Gilvin attributed the proposal to Fire, and wrote that the President "should keep his nose out of the local's politics." *Id.* at 1221. He also declared that "President Fire has his own problems" in the form of an "International financial crisis," charging that the union was operating at a deficit, that operating expenses were increasing, and that the Strike Fund had suffered a "$6,459,127.56 drop in one year." *Id.* Two days later, Gilvin demanded Fire's authorization to mail the letter to other IUE members at IUE expense, and Fire refused. On April 30, 1998, the six IUE District Presidents, who also served on the IUE's Executive Board and are defendants here, responded to Gilvin's April 26 letter with the following joint statement:

1. Ron Gilvin is hereby CENSORED [sic] for his publication and dissemination of false and scurrilous charges.

2. Ron Gilvin is directed to adhere to the IUE Constitution and to serve at the direction of the President.

3. Ron Gilvin is put on notice that if he continues these scurrilous attacks the undersigned will support the efforts now being considered by members outraged by his actions to recall him from office.

4. Ron Gilvin['s] right to engage in legitimate debate over the issues facing this union must be conducted in the future in a manner which sticks to the issues and avoids baseless slander.

*Id.* at 1230.

The conflict between Gilvin and the defendants continued to escalate in May of 1998. On May 20, Gilvin sent Fire a memorandum, seeking his assistance in auditing the financial records of the IUE's districts, particularly the "wage and oper-

---

lem starting a recall petition...."); *id.* at 1470 ("I think that we should draw the line, and put an end to all this mudslinging....").

4. *See, e.g.,* J.A. 1484–85 ("I would not testify against this International Union even if I disagreed with its leadership or its Executive Board.... I guess I have a problem, Ron.... with you showing up in the court-

room ... not to testify on our side, but on the side of Local 801...."); *id.* at 1486 ("That bothered me ... that the Secretary–Treasurer of this International Union showed up to testify against this International Union, that bothered me."); *id.* at 1500 ("[D]on't kid me that you were subpoenaed. You were subpoenaed because they knew how you were going to testify.").

ating subsidies" paid to the districts by the International. *Id.* at 1232. Fire refused to authorize an audit, telling Gilvin that, under the IUE constitution, the Secretary–Treasurer may perform a district audit only if the district "has been delinquent for thirty days or more or ... when there is reason to believe that [the district's] financial affairs ... are being mishandled or a defalcation has occurred." *Id.* at 1234 (quoting IUE Const. Art. XIII(N)). Fire directed Gilvin to provide, immediately and in writing, any information he possessed pertaining to any such misconduct. *Id.*

Gilvin again revoked permission for the use of his facsimile signature on May 27, 1998, stating that he would personally sign any check that was accompanied by "proper vouchers or other backup" or that he could "verify through audits as being constitutionally proper and legal." *Id.* at 1263. The next day, Fire wrote Gilvin a memorandum stressing that the Secretary–Treasurer was not authorized "to determine the spending policies of the International Union," and further suggesting that if Gilvin attempted to do so, he would cause "a serious constitutional crisis." *Id.* at 250. On June 2, 1998, Gilvin refused to sign subsidy checks to the six districts. In a letter to the comptroller, Gilvin stated that he had sought to verify by audit "the validity and purpose of these extraordinary payments," but had "been refused my constitutional authority to account for these expenditures." *Id.* at 1331. "Until a resolution is reached," Gilvin said, "I do not intend to process any form of supplements [i.e., subsidies] that I cannot account for, and [that] I have reason to ... believe violates our Constitution or has legal implications." *Id.*

Fire convened the Executive Board to discuss Gilvin's revocation of his facsimile signature and his refusal to sign the subsidy checks. On June 9, 1998, the Board passed a resolution declaring that the six district checks were properly documented and legitimate union expenses, that Gilvin was constitutionally required to sign the checks, that a committee should investigate Gilvin's conduct, and that Gilvin should in the interim be suspended with pay from the office of Secretary–Treasurer. *Id.* at 351–52. On July 15, 1998, the Board's appointed committee issued a report concluding that Gilvin's suspension "was right, proper and fully justified," and recommending that the IUE membership consider initiating "the recall of Ron Gilvin from the office of International Secretary Treasurer." *Id.* at 300–01.

Two local unions petitioned for Gilvin's recall by election. *Id.* at 378–79. Those petitions were endorsed by 92 additional locals comprising over 37% of the IUE's total membership, *id.* at 380, thus readily satisfying the constitutional requirements for initiating a recall. *See* IUE Const. Art. X(A). On October 9, 1998, the IUE's Trustees announced that more than 75% of the locals, representing more than 75% of the eligible union members, had voted in favor of the recall. J.A. 419. As that was more than sufficient to accomplish a recall, *see* IUE Const. Art. X(A), the Trustees declared Gilvin recalled from office effective the following day. J.A. 419.

## II

Gilvin filed suit against the IUE, President Fire, and individual members of the Executive Board, charging that the defendants had violated § 101(a) of the Labor–Management Reporting and Disclosure Act (LMRDA), part of the "Bill of Rights of Members of Labor Organizations." 29 U.S.C. § 411(a); *see id.* §§ 411–15. Gilvin alleged that, in *suspending* him from office, the defendants had violated his rights: (i) to free expression, under § 101(a)(2), because the suspension was imposed in retaliation for his criticizing the defen-

dants;[5] (ii) to appear as a witness in a judicial proceeding, under § 101(a)(4), because it was imposed for responding to a subpoena in the litigation involving Local 801;[6] (iii) to communicate with legislators, under § 101(a)(4), because it was imposed for writing to the Hoekstra Committee; and (iv) to equal rights, under § 101(a)(1), because it was imposed for criticizing defendants and appearing as a witness.[7] Gilvin also charged that, in *removing* him from office, the defendants had violated his rights under: (v) all three LMRDA subsections cited above; and (vi) the recall provisions of Article X(A) of the IUE constitution.[8]

On September 15, 1999, the district court dismissed two categories of Gilvin's

charges for failure to state a claim upon which relief can be granted, pursuant to Federal Rule of Civil Procedure 12(b)(6). *Gilvin v. Fire (Gilvin I)*, No. 99–cv–530, slip op. at 6, 9–10 (D.D.C. Sept. 15, 1999). The court dismissed Gilvin's LMRDA § 101(a)(1) claim because he had not alleged the violation of any "equal right" enumerated in that subsection: i.e., the right to nominate candidates, to vote in elections, to attend membership meetings, or to participate in such meetings. *See* 29 U.S.C. § 411(a)(1). And the court dismissed Gilvin's claim under the IUE constitution because he had failed to respond to defendants' contention that the recall had been initiated and carried out in accord with the requirements of Article X(A).

---

**5.** Subsection 101(a)(2) provides:

Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, argument, or opinions...: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2).

**6.** Subsection 101(a)(4) states:

No labor organization shall limit the right of any member thereof to institute an action in any court, or in a proceeding before any administrative agency, irrespective of whether or not the labor organization or its officers are named as defendants or respondents in such action or proceeding, or the right of any member of a labor organization to appear as a witness in any judicial, administrative, or legislative proceeding, or to petition any legislature or to communicate with any legislator....

29 U.S.C. § 411(a)(4).

**7.** Subsection 101(a)(1) states:

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the la-

bor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

29 U.S.C. § 411(a)(1).

**8.** The complaint further charged other violations of the IUE constitution. Those charges were dismissed by the district court, and Gilvin has not pursued them here. *See* Gilvin Br. at 14.

Gilvin's LMRDA claims were brought pursuant to LMRDA § 102, 29 U.S.C. § 412, which provides: "Any person whose rights secured by the provisions of this subchapter have been infringed by any violation of this subchapter may bring a civil action in a district court of the United States...." The claims for violation of the IUE constitution were brought under § 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a), which states: "Suits for violation of contracts between ... labor organizations, may be brought in any district court of the United States having jurisdiction of the parties...." *See Wooddell v. Int'l Bhd. of Elec. Workers, Local 71,* 502 U.S. 93, 98, 112 S.Ct. 494, 116 L.Ed.2d 419 (1991) (holding that § 301(a) "extends to suits on union constitutions brought by union members").

On July 21, 2000, the district court granted summary judgment against Gilvin's remaining LMRDA claims pursuant to Federal Rule of Civil Procedure 56. *Gilvin v. Fire (Gilvin II)*, No. 99–cv–530, slip op. at 22 (D.D.C. July 21, 2000). The court rejected Gilvin's § 101(a)(2) claim, that defendants had suspended him in retaliation for criticizing them, because it found Gilvin's speech unprotected by the statute. Subsection 101(a)(2) protects only the rights of union members, the court ruled, not of union officers. Moreover, the court found Gilvin's criticism so harsh that "Gilvin could not effectively represent the union as an officer while making such accusations against its other leaders." *Id.* at 17.

The district court also rejected Gilvin's § 101(a)(4) claim of retaliatory suspension for his January 1998 appearance in the Local 801 litigation. The court found that there was "a genuine issue of fact as to whether Defendants suspended Gilvin in retaliation for his participation in that litigation." *Id.* at 19. But the court held that Gilvin was unprotected by § 101(a)(4) for two reasons: because, as with § 101(a)(2), the statute does not protect union officers, and because Gilvin had not actually testified in the Local 801 litigation. *Id.* at 20. The court further dismissed Gilvin's § 101(a)(4) claim that he was suspended in retaliation for writing to the Hoekstra Committee, on the ground that Gilvin had failed to submit "evidence that Defendants knew of his anonymous letter." *Id.* at 18.

Finally, the district court rejected all claims concerning Gilvin's removal by recall election because that election had been conducted fully in accordance with the provisions of the IUE constitution. Since Gilvin had produced no evidence that the election's results or procedures were tainted, the district court found that the LMRDA provided no basis for setting aside the union members' democratic choice. *Id.* at 10–13.

### III

We review both of the district court's orders de novo. *See Wilson v. Pena*, 79 F.3d 154, 160 n. 1 (D.C.Cir.1996) ("Our standard of review under Federal Rules 12(b)(6) and 56 is the same: de novo."). In considering the claims dismissed pursuant to Rule 12(b)(6), we must treat the complaint's factual allegations as true, must grant plaintiff the benefit of all reasonable inferences from the facts alleged, and may uphold the dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C.Cir.2000) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)); *see id.* at 1113. As for the claims denied on summary judgment pursuant to Rule 56, we may affirm only if "there is no genuine issue as to any material fact [and] the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed. R.Civ.P. 56(c)). A dispute about a material fact is "genuine" if a reasonable jury, drawing all reasonable inferences in Gilvin's favor, could return a verdict against the defendants. *See Flemmings v. Howard Univ.*, 198 F.3d 857, 860 (D.C.Cir. 1999); *Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C.Cir.1999).

Applying these standards, we conclude that the district court erred in granting summary judgment against two of Gilvin's claims: that he was suspended for exercising his LMRDA § 101(a)(2) right to free expression, and for exercising his § 101(a)(4) right to appear as a witness in a judicial proceeding. We consider these

claims in Parts IV and V below. We conclude that the court properly dismissed the remainder of Gilvin's claims, which we discuss in Part VI.

## IV

We begin with Gilvin's allegation that he was suspended for his criticism of Fire and the Executive Board, in violation of LMRDA § 101(a)(2). That subsection states that "[e]very member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, argument, or opinions." 29 U.S.C. § 411(a)(2). It also includes a proviso that "nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations." *Id.* Defendants contend that Gilvin was not suspended because of his criticism, but because his refusal to sign or authorize his facsimile for use on IUE checks constituted insubordination and derogation of his official duties in a manner that falls within the proviso. Summary judgment was warranted, defendants contend, because there was "no genuine issue of material fact" as to whether Gilvin's criticism caused his suspension.

Defendants may be correct that Gilvin could have been suspended for an unreasonable refusal to inscribe his signature on IUE checks.[9] But the district court did not find that there was no genuine issue regarding the actual motivation for the

suspension. And we certainly cannot make such a finding on the record before us, given the defendants' repeated attacks on Gilvin for sending critical letters, and their declarations that something had to be done to stop him from sending more. *See supra* notes 2, 3 and pp. 753–54.

■ Rather than rely on the absence of a genuine factual dispute, the district court determined that Gilvin's criticism of the other union leaders was unprotected by § 101(a)(2). First, the court held that § 101(a)(2) protects the free speech rights only of union members, not of union officers. That holding was an error of law. In *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), the Supreme Court held that § 101(a)(2) does not protect *appointed* union officials from discharge on account of the expression of their opinions. But seven years later, in *Sheet Metal Workers' International Association v. Lynn,* 488 U.S. 347, 109 S.Ct. 639, 102 L.Ed.2d 700 (1989), the Court announced a different rule for *elected* officials like Gilvin. In *Lynn,* an elected business agent was removed from his post in retaliation for statements he made at a union meeting in opposition to a dues increase sought by the union trustee. Although removal of an appointed agent under such circumstances would not have been protected under *Finnegan,* the *Lynn* Court held that "[t]he consequences of the removal of an elected official are much different." *Id.* at 355, 109 S.Ct. 639. "To begin with," the Court said, "when an elected official like Lynn is removed from his post, the union members are denied the representative of their choice." *Id.*

---

9. The qualifier "unreasonable" is necessary because Gilvin could not lawfully have signed a check that, for example, violated his fiduciary obligations as Secretary–Treasurer. *See* 29 U.S.C. § 501(a) (setting forth the fiduciary obligations of the officers of a labor organization with respect to the organization's "mon-

ey and property"); IUE Const. Art. VII(B) (requiring the Secretary–Treasurer to "account for all monies" of the union); *see also* 29 U.S.C. § 501(c) (imposing a fine or imprisonment for, inter alia, embezzlement of union funds).

"Furthermore," the Court continued, "the potential chilling effect on [LMRDA] free speech rights is more pronounced when elected officials are discharged." *Id.* In such cases, "[n]ot only is the fired official likely to be chilled in the exercise of his own free speech rights, but so are the members who voted for him." *Id.* Accordingly, the Court held that "Lynn's retaliatory removal stated a cause of action under § 102." *Id.*

Defendants seek to distinguish *Lynn* on the ground that there the officer was removed from office, while this aspect of Gilvin's claim relates only to his suspension.[10] The distinction, however, is insufficient to persuade us that *Lynn* is inapplicable here. The term of Gilvin's suspension was indefinite, and it immediately relieved him of all official authority. That action implicates the same concerns relied upon by the Court in *Lynn*: Union members who voted for Gilvin were denied the representative of their choice for the length of the suspension, and both Gilvin and those who observed what happened to him were likely to be "chilled in the exercise" of their free speech rights. *Lynn*, 488 U.S. at 355, 109 S.Ct. 639. We are unable to perceive a difference in the degree of "chill" generated by suspension as compared to removal sufficient to justify a difference in outcomes.

■ Second, the district court held that "Gilvin's letters to union members criticizing Defendants were not protected under 101(a)(2) because they were inconsistent with [his] duties [and] preclude[d] his effective representation of the union." *Gilvin II*, slip op. at 16 (internal quotation omitted). The court was particularly concerned that Gilvin's letters were "replete with serious accusations against the IUE's President and Board." *Id.* at 17. But the fact that the letters were critical of the union leadership can hardly suffice to remove the protections of § 101(a)(2), a point defendants rightly conceded at oral argument. Indeed, as the Supreme Court noted in *Lynn*, such criticism was "precisely" what Congress intended to protect in passing the LMRDA.[11]

Nor does it matter that the tone of Gilvin's letters was harsh, and even intemperate. Subsection 101(a)(2)'s protection of a union member's right "to express any views, arguments, or opinions" is not limited to discourse clothed in the polite language of diplomats in striped pants.[12] Gilvin's opponents certainly did not think that they were so constrained, as they gave quite as good as they got. *See supra* notes 2–4.

Finally, there was nothing about the substance of Gilvin's criticism that was inconsistent with his duties as a union official. To the contrary, Gilvin's letters challenged the financial policy of the President and Executive Board, a topic well within the rights of any union member and certainly of the Secretary–Treasurer, whose responsibilities include "perform[ing] all such duties as may be

---

**10.** Gilvin's claims relating to his removal are discussed in Part VI.B below.

**11.** *See Lynn*, 488 U.S. at 355, 109 S.Ct. 639 ("[Congress] recognized that democracy would be assured only if union members are free to discuss union policies and criticize the leadership without fear of reprisal." (quoting *United Steelworkers v. Sadlowski*, 457 U.S. 102, 112, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982))).

**12.** *See Petramale v. Local No. 17 of Laborers Int'l Union*, 736 F.2d 13, 17 (2d Cir.1984) (noting that "union meetings, especially those involving ... disputes between rival factions within the union, ... can be fraught with tension and even sparked with vitriol and calumny," and holding that "leeway for the expression of strongly held views in emotional terms ... must be afforded union members") (internal quotation omitted).

deemed necessary to a proper and effective administration of the financial affairs of the Union." IUE Const. Art. VII(B); *see id.* (requiring Secretary–Treasurer to "account for all monies" of the union). Indeed, at oral argument defendants candidly agreed that no duty of Gilvin's office prevented him from expressing his views on such proposals as the transfer of money from the Strike Fund.[13]

■ In sum, because Gilvin's criticism of the union leadership was protected speech under § 101(a)(2), and because on this record a reasonable jury could find that Gilvin was suspended because of that criticism, the grant of summary judgment to defendants was erroneous.[14]

### V

Gilvin also claims that he was suspended, in violation of LMRDA § 101(a)(4), for appearing in federal court in response to a subpoena in a lawsuit brought against the International by IUE Local 801. Subsection 101(a)(4) provides that "[n]o labor organization shall limit the right of any member ... to appear as a witness in any judicial ... proceeding." 29 U.S.C. § 411(a)(4). Defendants dispute that Gilvin was suspended for his courthouse appearance, arguing that it "occurred months before his suspension, which was based upon an entirely different sequence of events." Fire Br. at 37. Accordingly, defendants insist that the district court's

grant of summary judgment on this claim was appropriate.

The problem with this argument, as with defendant's parallel argument under § 101(a)(2), is that the district court did not hold that there was no genuine issue of material fact as to whether Gilvin was suspended for his participation in the Local 801 litigation. To the contrary, the court, referring to statements made by defendants at the IUE Executive Board meeting of March 10, 1998, held: "These statements *do* create a genuine issue of fact as to whether Defendants suspended Gilvin in retaliation for his participation in that litigation." *Gilvin II*, slip op. at 19 (emphasis added); *see also supra* note 4.

■ Instead of relying on an absence of a genuine factual dispute, the district court once again concluded that the LMRDA offered Gilvin no protection. First, as with § 101(a)(2)'s protection of free speech, the court held that § 101(a)(4)'s protection of the right to appear as a witness applies only to union members and not to officers: As an officer, the court held, "Gilvin was not protected by section 101(a)(4) against retaliation for his involvement with the Local 801 lawsuit." *Id.* at 20. For the reasons described in the previous section, this conclusion is erroneous as applied to an elected officer like Gilvin. Although *Lynn* itself involved § 101(a)(2), there is no reason to suspect that its principles are not equally applicable to

13. *Cf. Lynn,* 488 U.S. at 355 n. 6, 109 S.Ct. 639 ("There is no suggestion that Lynn's speech in opposition to the dues increase contravened any obligation properly imposed upon him as an elected business agent of the Local.").

14. Gilvin also sought, and was denied, recovery under § 101(a)(2) on the theory that defendants were involved in a "scheme to suppress dissent." This theory, adopted by the Second Circuit, provides a cause of action for appointed union officers who are unprotected

under *Finnegan* and *Lynn*. *See Maddalone v. Local 17, United Bhd. of Carpenters,* 152 F.3d 178, 184 (2d Cir.1998). At least with respect to elected officers, however, the Supreme Court expressly rejected the contention "that a union official must establish that his firing was part of a systematic effort to stifle dissent within the union in order to state a claim." *Lynn,* 488 U.S. at 355 n. 7, 109 S.Ct. 639. Thus, Gilvin's free speech claim depends only upon whether he can show retaliation against protected expression. He need not demonstrate any broader "scheme."

§ 101(a)(4). The right at stake here—the right to appear as a witness in a judicial proceeding—is just as likely as the right of free speech to be chilled by punishment for its exercise.[15]

■ Second, the district court held that because Gilvin "never did actually testify at the January 1998 proceeding," he "did not engage in activity that would be protected by section 101(a)(4) even if undertaken by a union member." *Gilvin II*, slip op. at 20. But if § 101(a)(4)'s command—that a union may not "limit" a member's right to "appear" as a witness—were restricted to those members who actually testify, it would be a flimsy protection indeed. Witnesses often are called to the courthouse, yet end up not testifying. The reasons vary widely, and are usually wholly beyond the witnesses' control: ranging from judicial rulings, to stipulations on the subject of their testimony, to counsel's last minute strategic decisions. Since potential witnesses can rarely be guaranteed that they will testify, a rule like that adopted by the district court would chill their willingness to appear. Indeed, carried to its logical extreme, restricting the protection of § 101(a)(4) to those who actually testify would permit an antagonist to impose all kinds of impediments to a witness' appearance at the courthouse—as long as the impediments succeed in keeping the witness off the stand, or are put in place before the testimony actually begins. There is no justification for such a narrow reading of such an important element of a union member's Bill of Rights.[16]

■ Accordingly, because Gilvin's appearance at the federal courthouse in connection with the Local 801 litigation was protected conduct under LMRDA § 101(a)(2), and because there is a genuine issue of material fact as to whether Gilvin was suspended because of that appearance, the grant of summary judgment to defendants on this claim must be reversed.

## VI

In the following sections, we consider Gilvin's remaining claims. These do not fare as well, substantially for the reasons stated by the district court.

## A

■ Gilvin contends that his suspension violated LMRDA§ 101(a) on two grounds in addition to those discussed in Parts IV and V. First, Gilvin claims that his suspension for criticizing defendants and for appearing as a witness violated not only LMRDA §§ 101(a)(2) and (4), but also § 101(a)(1)—which guarantees every member of a labor organization:

equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organization, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings....

29 U.S.C. § 411(a)(1). But Gilvin does not dispute that he did vote, did attend membership meetings, and did participate in deliberations. Accordingly, this claim was properly dismissed because, as the district

---

15. *See International Org. of Masters v. Prevas*, 175 F.3d 341, 344 (4th Cir.1999) (holding that the LMRDA bars any conduct that either limits or is "likely to chill the exercise of a member's right to [sue]" (quoting *NLRB v. Industrial Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 425, 88 S.Ct. 1717, 20 L.Ed.2d 706 (1968))).

16. *See Phillips v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 118*, 556 F.2d 939, 942 (9th Cir.1977) (declaring that "[i]f a union member's right [under § 101(a)(4)] is to have any meaning, courts must be ever vigilant in protecting that right against indirect and subtle devices as well as against direct and obvious limitations").

court held, Gilvin has failed to articulate how he was deprived of any of the specific rights protected by § 101(a)(1). *See Carothers v. Presser,* 818 F.2d 926, 931 (D.C.Cir.1987) (holding that to prevail on an equal rights claim under § 101(a)(1), a plaintiff must demonstrate that defendants "deprived the plaintiff[ ] of a right *specifically enumerated* in the statute, such as the right to an equal vote").

Second, Gilvin claims that he was suspended in violation of LMRDA § 101(a)(4) for writing a letter to the Hoekstra Committee alleging that IUE checks had been issued without an identifiable union purpose. Retaliation for such an act would have violated Gilvin's right "to communicate with any legislator." 29 U.S.C. § 411(a)(4). But Gilvin acknowledges that he sent the letter anonymously, and, as the district court found, he "has not offered any evidence that Defendants knew of his anonymous letter to the Hoekstra Committee, thus leaving no foundation for his argument that they suspended him in retaliation for it." *Gilvin II,* slip op. at 18.

### B

Gilvin further contends that his ultimate *removal* from office violated the rights guaranteed by LMRDA § 101(a) and the recall provisions of the IUE constitution. Neither the statute nor the theory of the *Lynn* case, however, protects a union official—elected or otherwise—from removal *by a recall election.* The *Lynn* Court noted that, in adopting "Title I of the LMRDA .... Congress sought to further the basic objective of the LMRDA: ensuring that unions [are] democratically governed and responsive to the will of their memberships." *Lynn,* 488 U.S. at 352, 109 S.Ct. 639. The Court concluded that protecting elected officials from removal by other officials in retaliation for their speech was necessary to ensure democratic responsiveness. *Id.* at 355, 109

S.Ct. 639. But that rationale has no application to removal by a recall election. Removing an officer by a vote of the union's membership, because his opinions no longer represent the will of that membership, represents the *expression* of democracy, not its subversion.

Moreover, we agree with the district court's conclusion that "Gilvin provide[d] no evidence to support his claim that the recall vote was tainted" or that the IUE constitution was violated in any way. *Gilvin II,* slip op. at 13. Two local unions initiated the petition for recall, with the endorsement of 92 other locals comprising over 37% of the IUE's total membership. J.A. 380. This was substantially more than was constitutionally required for initiation of a recall. *See* IUE Const. Art. X(A) (requiring initiation by one local, with the endorsement of at least 25 others comprising 25% of the IUE membership). More than 270 locals, representing more than 75% of both the locals and the eligible IUE membership, voted in favor of the recall, J.A. 419—far in excess of the number required to remove Gilvin from office. *See* IUE Const. Art. X(A) ("The President or Secretary–Treasurer shall be declared recalled if locals having a majority of the members of the Union in good standing have voted for his or her recall."). Although Gilvin had every right to disagree with the policies of the IUE's President and Executive Board, it is apparent that the union's membership did not share that disagreement, and Gilvin had no right to remain in office once the members resoundingly voted him out.

### VII

For the reasons stated in Parts IV and V, we reverse the district court's grant of summary judgment against Gilvin on his claims that defendants violated his rights to free speech and to appear as a witness, by suspending him from office in retalia-

tion for the exercise of those rights. *See* LMRDA §§ 101(a)(2), (4), 29 U.S.C. §§ 411(a)(2), (4).[17] In making this determination, we have, as required by the applicable standard of review, examined the evidence in the light most favorable to Gilvin, and we express no views regarding the merits or ultimate outcome of the case. *See Borgo v. Goldin,* 204 F.3d 251, 254 (D.C.Cir.2000). For the reasons stated in Part VI, the remaining portions of the district court's judgment, including the court's grant of summary judgment against Gilvin on claims arising out of the recall election, are affirmed.

*Affirmed in Part and Reversed in Part.*

---

**17.** The district court granted summary judgment in favor of defendants in their individual capacities solely on the ground "that Gilvin's public speech and anticipated testimony in judicial proceedings were not protected from retaliation under the LMRDA." *Gilvin II,* slip op. at 22; *see id.* at 21 (noting that "an individual union officer may be individually liable under Title I [of the LMRDA] if he or she 'aids, abets, instigates or directs a wrong-ful use of union power to deprive a member of his rights under § 101'" (quoting *Rosario v. Amalgamated Ladies' Garment Cutters' Union, Local 10,* 605 F.2d 1228, 1246 (2d Cir. 1979))). Since we hold that Gilvin's speech and courthouse appearance were protected, we necessarily reverse the grant of summary judgment in favor of the individual defendants as well.