# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 6, 2009        Decided May 15, 2009

No. 08-7068

ALFRED WINDER,
APPELLANT

v.

LOUIS ERSTE, INDIVIDUALLY, AND AS CHIEF OPERATING
OFFICER OF THE DIVISION OF TRANSPORTATION,
DISTRICT OF COLUMBIA PUBLIC SCHOOLS, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:03-cv-02623)

*John F. Karl Jr.* argued the cause and filed the briefs for appellant.

*Richard S. Love*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellees. With him on the brief were *Peter J. Nickles*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General.

Before: HENDERSON, BROWN, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Alfred Winder managed the transportation division of the District of Columbia Public Schools (DCPS) from 1999 until he was fired in 2003. He brought suit against the District of Columbia, DCPS, and several DCPS officials, claiming, among other things, that his firing not only was a breach of contract but also violated his constitutional and statutory rights to report supervisors' misconduct without fear of retaliation. The district court ruled against Winder on every contested issue. We affirm its decision, with one exception. Because there is a genuine issue whether Winder was an at-will employee who served at the pleasure of his employer or had a contractually protected term of employment, we reverse the grant of summary judgment against his claims of premature termination and violation of procedural due process.

## I.

### A.

In 1999, DCPS hired Winder as General Manager of its transportation division. Winder was responsible for the management, administration, and operation of transportation services for special education students. His duties primarily consisted of helping DCPS comply with court orders issued in *Petties v. District of Columbia*, No. 95-0148 (D.D.C.), a class action brought by parents of special education students frustrated with the District's failure to provide their children with adequate transportation. The *Petties* orders mandated specific standards and procedures for DCPS's transportation of special education students. The court appointed a Special Master and a Transportation Administrator to oversee

implementation of the orders. Winder's job included regular communication with these officials.

From 1999 to 2002, Winder was employed under a series of one-year contracts. In a 2002 reorganization, DCPS abolished the positions of all its managers and created new managerial jobs. Managers who wanted to stay with DCPS had to apply for these jobs. DCPS posted a vacancy announcement for the "new" job of General Manager of the transportation division (which had the same duties and responsibilities as the position Winder had held). The announcement described the position as "Senior Executive" and stated that "Appointees to this position serve at the pleasure of the appointing authority." Supp. App. at 1. Winder applied for and received the job. A letter summarizing the terms of his employment stated that it would commence on July 22, 2002, and that "[t]he tenure of this contract is one year from the commencement date." Letter from Louis J. Erste, Chief Operating Officer, D.C. Pub. Sch. Transp. Div., to Alfred Winder, Gen. Manager of Transp., D.C. Pub. Sch. (July 17, 2002). The letter also explained that Winder was entitled to a range of benefits, including an employer-paid pension plan as well as sick and annual leave.

Despite the contract's one-year term, DCPS terminated Winder on April 3, 2003. His firing followed years of tension between Winder and his supervisors, stemming from Winder's belief that they were resisting or interfering with efforts to comply with the *Petties* orders. Tensions peaked during Winder's 2002–2003 contract term. First, in late 2002, Winder placed nearly fifty phone calls to the Special Master reporting problems with his supervisors. According to Winder, they began to retaliate against him as a result. They pressured him to resign, encouraged parents and school board

members to file complaints against him, and falsely told his staff that he planned to resign.

The hostilities escalated after December 2002, when DCPS bus drivers walked off the job to protest a new policy that deprived them of earned benefits. Two of Winder's supervisors, Louis Erste and Kennedy Khabo, testified about the driver walkout at a January 2003 meeting of the D.C. Council Committee on Education, Libraries, and Recreation. Winder attended the meeting but did not sit with his supervisors at the witness table. When Erste and Khabo failed to provide answers to the satisfaction of a councilman, he summoned Winder to the table. According to Winder, Erste was angered by the answers he gave and expressed hostility toward him after the meeting.

The next month, Winder filed a complaint with the D.C. Inspector General against Erste and Khabo. The complaint recited the difficulties Winder was experiencing in carrying out his job duties because of them. It also charged both with filing false affidavits in the *Petties* litigation, blocking compliance with court orders, and harassing Winder and others.

Winder left work for an extended, pre-approved medical leave in March 2003. During this leave he received a letter from DCPS telling him he was being discharged. Although he has since found new employment, Winder alleges that his former supervisors made it hard for him to do so. For example, when Winder asked a friend in the D.C. government about an open transportation position, he was told that Deputy Mayor Herb Tillery considered him "persona non grata" based on information from DCPS officials.

**B.**

Winder filed this action in the district court in December 2003, asserting constitutional, statutory, and common law claims. The district court resolved almost all of these claims in favor of the defendants.[1] We discuss only those claims relevant to this appeal.

In a March 2005 order, the court dismissed several of Winder's claims under FED. R. CIV. P. 12(b)(6) for failure to state a claim. The court dismissed Winder's common-law tort claims for unliquidated damages and his claims under the D.C. Whistleblower Act because he failed to provide the pre-suit notice required by statute. The court also dismissed Winder's other common-law tort claims and his breach of contract claims, holding that they were preempted by the D.C. Comprehensive Merit Personnel Act (CMPA), which governs grievances of District employees. Winder sought reconsideration of the dismissal of his breach of contract claims. For the first time, Winder informed the court that he had already pursued relief under the CMPA. In December 2004, the District agency charged with enforcing that statute held that it lacked jurisdiction over his claims. The court therefore reinstated the claims that it had earlier held were preempted by the CMPA. It did not reinstate the preempted tort claims because Winder failed to seek their reconsideration.

In September 2007, the court granted summary judgment in favor of the District and several individual defendants on Winder's First Amendment claims. It held that under *Garcetti*

---

[1] The court ruled in Winder's favor on his uncontested claim that the District owed him compensation for 176 hours of sick leave.

*v. Ceballos*, 547 U.S. 410 (2006), Winder's speech was not protected because he spoke pursuant to his official duties when he complained to DCPS officials, reported problems to the *Petties* Special Master, testified before the D.C. Council, and filed a complaint with the D.C. Inspector General. The court also granted summary judgment against Winder's claims that the defendants breached his written contract and violated his procedural due process rights when they fired him before the end of his one-year term. The court found that Winder was a member of the Executive Service and thus, under D.C. law, an at-will employee who served at the pleasure of the mayor.

The district court issued its final ruling on May 20, 2008, disposing of Winder's claims that the District breached his contract by denying him certain benefits. As to unpaid compensatory time, the court held that the 2002 contract did not provide for such payment, that regulations requiring payment did not apply to Winder, that an alleged pre-contract promise by a former supervisor was not incorporated into the contract, and that Winder had not pleaded breach of any pre-2002 contract. As to pension benefits, the court held that Winder had not met the minimum vesting period under D.C. regulations and federal law.

## II.

On appeal, Winder challenges the district court's Rule 12(b)(6) dismissal of his D.C. Whistleblower Act claims and its summary judgment rulings against his First Amendment claim, his breach of contract claims, and his procedural due process claim. We review these dispositions de novo. *See Gilvin v. Fire*, 259 F.3d 749, 756 (D.C. Cir. 2001). A court may dismiss under Rule 12(b)(6) if, accepting the allegations in the complaint as true, the plaintiff has nonetheless failed to

state plausible grounds for relief. *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007). Summary judgment is appropriate if, drawing all reasonable inferences in the nonmovant's favor, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Gilvin*, 259 F.3d at 756.

**A.**

We first address the dismissal of Winder's D.C. Whistleblower Act claims for lack of pre-suit notice. The Act provides that supervisors of District employees "shall not threaten to take or take a prohibited personnel action or otherwise retaliate against an employee because of the employee's protected disclosure." D.C. CODE § 1-615.53 (2006). Aggrieved employees may bring a civil action seeking reinstatement, back pay, restoration of lost benefits, compensatory damages, and other relief. *Id.* § 1-615.54(a). But the Act imposes a notice obligation on plaintiff employees: "A civil action brought pursuant to this section shall comply with the notice requirements of § 12-309." *Id.* Section 12-309 of the D.C. Code is a general notice provision applicable to all tort claims against the District: "An action may not be maintained against the District of Columbia for unliquidated damages . . . unless, within six months after the injury . . . the claimant . . . has given notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage."

The question for us is whether, as the district court held, the Whistleblower Act requires the written notice described in section 12-309 for all claims. Section 12-309 itself imposes this obligation only on plaintiffs seeking unliquidated damages. But the district court dismissed all of Winder's Whistleblower Act claims for lack of notice, holding that "the

Act . . . specifies that compliance with § 12-309 is required before bringing a civil action for any of the remedies authorized thereunder." *Winder v. Erste*, No. 03-2623, slip op. at 19 n.11 (D.D.C. Mar. 31, 2005). Winder does not dispute that he failed to provide pre-suit notice to the District, but he challenges the dismissal of his Whistleblower Act claims for injunctive relief and back pay. He argues that because section 12-309 only requires notice for unliquidated damages claims, the Act's incorporation of section 12-309 must include that limitation as well.

We disagree. The district court's reading of the Whistleblower Act is faithful to the plain language of the statute. The Act incorporates only "the notice requirements of § 12-309," D.C. CODE § 1-615.54(a), which call for written notice to the D.C. Mayor within six months after the injury is sustained, *see id.* § 12-309. Unlike section 12-309, the Whistleblower Act does not limit the application of those requirements to specific claims for relief. Rather it mandates compliance in "[a] civil action brought pursuant to this section." *Id.* § 1.615.54(a). Our reading of the statute is reinforced by the "cardinal rule of statutory interpretation that no provision should be construed to be entirely redundant," *Kungys v. United States*, 485 U.S. 759, 778 (1988) (plurality opinion of Scalia, J.). Winder's interpretation of section 1.615.54(a) would render it redundant with section 12-309, which already applies its notice requirements to *any* claim for unliquidated damages against the District. The district court properly rejected this interpretation and dismissed all of Winder's Whistleblower Act claims for failure to comply with the pre-suit notice requirements.

**B.**

We next address the district court's conclusion that Winder's various complaints about his DCPS supervisors are not protected by the First Amendment. On appeal, Winder limits his challenge to his testimony before the D.C. Council, his reports to the *Petties* Special Master, and his complaint to the D.C. Inspector General. He argues that the defendants violated his First Amendment rights by firing him in retaliation for these actions.

A public employee like Winder "does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment," *Connick v. Myers*, 461 U.S. 138, 140 (1983). At the same time, the government as employer must be able to prevent employees' speech from interfering with the "efficient provision of public services." *Garcetti*, 547 U.S. at 418. The threshold question for a public employee's First Amendment claim is "whether the employee spoke as a citizen on a matter of public concern." *Id.* If so, his speech is protected unless the government can justify treating its employees differently from other citizens. But if the employee spoke "pursuant to" his official duties, he cannot claim constitutional protection. *Id.* at 421.

Winder argues that he spoke as a citizen because his statements were made publicly, voluntarily, and outside his chain of command. But by his own description, Winder's responsibilities with DCPS included implementing the *Petties* court orders and reporting regularly to the Special Master. J.A. at 120 ¶ 29, 183 ¶ 44 (Amended Complaint). Winder was hired to help DCPS comply with the *Petties* court orders. And in each communication at issue on appeal he acted in furtherance of that duty by exposing the efforts of DCPS officials to block compliance.

In our cases applying *Garcetti*, we have consistently held that a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command. *See Thompson v. District of Columbia*, 530 F.3d 914, 917–18 (D.C. Cir. 2008) (Chief of Security for D.C. Lottery Board spoke pursuant to duty to maintain Board's financial integrity when he reported Board members' financial misconduct); *Wilburn v. Robinson*, 480 F.3d 1140, 1151 (D.C. Cir. 2007) (employee hired "to root out discrimination in the District government" did not speak as citizen when reporting discriminatory hiring practices); *cf. Tao v. Freeh*, 27 F.3d 635, 640 (D.C. Cir. 1994) (FBI translator spoke as citizen when reporting racial discrimination because her job duties did not include exposing or preventing discrimination). In reporting his supervisors' alleged obstruction of the *Petties* orders to the Special Master, Winder was fulfilling his undisputed duty to see that those orders were implemented. Likewise, his complaint to the D.C. Inspector General requested a formal inquiry into Erste and Khabo's efforts to block implementation of the orders.

Finally, Winder's testimony to the D.C. Council committee about the DCPS bus driver walkout was also pursuant to his duty to implement the orders. The *Petties* orders required DCPS to transport students in a punctual manner using qualified, properly trained drivers. *See, e.g.*, No. 95-0148 (D.D.C. July 9, 1999) (order summarizing DCPS obligations). The drivers' walkout prevented that from happening. And although, as Winder points out, ordinary citizens often speak at city council meetings, Winder was not merely speaking as a citizen when he answered the councilman's questions. In testifying, he was promoting DCPS's compliance with the *Petties* orders—a duty he was

being "paid to perform," *Garcetti*, 547 U.S. at 422. If the facts before us were different—if Winder was not hired to enforce the *Petties* orders but to perform some other function within DCPS—his testimony before the committee might fall within the protection of the First Amendment. But by Winder's own description, it was his job to implement the *Petties* court orders. His testimony was an attempt to ensure proper implementation of those orders and was therefore offered pursuant to his job duties.

Winder argues that his complaints could not be part of his official duties because his supervisors at DCPS did not want him to speak candidly to officials who were reviewing the system's compliance with the *Petties* orders. *Wilburn* forecloses this argument. In that case, the employee complained of discriminatory hiring practices and the supervisor did not approve of the speech at issue. *See* 480 F.3d at 1142–43, 1151. But we held the speech unprotected because the employee's specific duties included "root[ing] out discrimination in the District government," *id.* at 1151, and the government as employer is free to control the content of "speech that owes its existence to a public employee's professional responsibilities," *Garcetti*, 547 U.S. at 421. Although some complaints of hiring discrimination might receive First Amendment protection, they are not covered when made by an employee whose job duties involve exactly such complaints. So too here, although testimony before a city council might otherwise be just the sort of citizen speech protected by the First Amendment, the uncommonly close relationship between Winder's duties and his advocacy before the council precludes protection. Thus as in *Wilburn*, the disapproval of Winder's supervisors does not bring his comments within the scope of the First Amendment.

Finally, Winder argues that the district court improperly broadened the *Garcetti* test by holding unprotected any speech that "concerns" an employee's job duties. Had the district court so held, we agree that it would be in error. Speech can be covered by the First Amendment even if it is related to one's job function. *See, e.g.*, *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) (holding that the First Amendment protects a school teacher's speech about the school district's use of taxpayer revenue). But Winder mischaracterizes the district court's holding. The court observed that all of the speech Winder cited "concerned" his official duties. *Winder v. Erste*, 511 F. Supp. 2d 160, 173 (D.D.C. 2007). But it did not rest its conclusion on that fact. Rather it explained, as we have, how in each instance Winder's speech was an attempt to implement the *Petties* orders and was therefore "pursuant to" his official duties. *Id.* at 173–75.[2]

Some remedy, such as a properly preserved claim under the whistleblower protection laws, may have been available to Winder. But the district court correctly held that the First Amendment does not provide that remedy.

---

[2] By contrast, the district court held that Winder's complaints to Erste and Khabo were unprotected because they were made to his supervisors and concerned "the precise subject matter of his employment." *Winder*, 511 F. Supp. 2d at 173. This holding could be read as broader than the "pursuant to" standard. But the court only applied this reasoning to the complaints to Erste and Khabo, and Winder does not challenge the First Amendment status of those complaints on appeal. Accordingly, we need not decide whether this arguable gloss on *Garcetti* for speech to supervisors is correct.

**C.**

The next question for us is whether the district court correctly held that Winder was an at-will employee without the protection of a contract. Two of Winder's claims—breach of the 2002 contract through premature termination and violation of procedural due process—turn on this question. If the 2002 contract did not guarantee Winder a one-year term, then DCPS did not breach that contract by firing him within a year. Similarly, if the contract did not give Winder a property interest in an employment term of one year, DCPS could not have violated his due process rights by depriving him of that interest.

The district court acknowledged that the plain language of the July 2002 employment contract, which provides for a one-year term, suggests that Winder was not an at-will employee. But the court found two reasons to look past the written contract. Most important, the court relied on the District's contention—and Winder's apparent agreement—that Winder was employed in the Executive Service. By statute, "[p]ersons serving in the Executive Service . . . shall serve at the pleasure of the Mayor." D.C. CODE § 1-610.51(b). Thus the court held that DCPS had no authority to hire Winder for a fixed term. The court also looked to the vacancy announcement for Winder's position: "Appointees to this position serve at the pleasure of the appointing authority." Supp. App. at 1.

The district court's reliance on section 1-610.51(b) was misplaced, because Winder could not have been a member of the Executive Service. DCPS lacked authority to classify him as such. The Executive Service consists of "any subordinate agency head whom the Mayor is authorized to appoint in accordance with subchapter X-A of this chapter." D.C. CODE

§ 1-603.01(9). A "subordinate agency" is "any agency under the direct administrative control of the Mayor." *Id.* § 1-603.01(17). At the time Winder worked for DCPS, the agency was under the control of the Board of Education. *See id.* § 38-102. The Board of Education was expressly excluded from the definition of "subordinate agency," *id.* § 1-603.01(17), and was instead included in the definition of an "independent agency" not subject to the administrative control of the Mayor, *id.* § 1-603.01(13). And Winder was not even the "head" of the transportation division, let alone DCPS or the Board of Education.

Moreover, appellees make no argument that Winder was "appointed in accordance with subchapter X-A," *id.* § 1-603.01(9). That subchapter requires the Mayor to nominate and the D.C. Council to confirm members of the Executive Service. *See id.* § 1-610.51(b) (directing the Mayor to nominate subordinate agency heads to the Executive Service using the process described in section 1-523.01); *id.* § 1-523.01(a) (requiring confirmation by the D.C. Council of all Executive Service nominees). Winder was neither nominated by the Mayor nor confirmed by the Council.

The district court's mistaken conclusion that Winder was part of the Executive Service may have resulted from personnel records listing Winder's job class and pay plan as "EX" and a representation by DCPS that these records "indicate that Mr. Winder was employed in the 'executive service.'" Supp. App. at 6, 8. The meaning of Winder's classification is unclear. There is nothing in the statute or regulations to support such a classification. According to the statute, Executive Service members are classified as "DX," not "EX." *Id.* § 1-610.52(a). And the regulations provide that employees under the control of the Board of Education (like Winder) were classified as "EA" (Board members), "EB"

(Excepted Service), "ET" (Former Teachers' Salary Act), "EG" (Former General Schedule), or "DS" (Career Service). *See* D.C. MUN. REGS. tit. 5, § 1102.3–.4. There was no category identified as "EX."

Without a finding that Winder was in the Executive Service and served at the pleasure of the Mayor, the sole remaining support for the district court's conclusion that he was an at-will employee is the statement in the vacancy announcement that appointees would serve at the pleasure of the appointing authority. But as Winder points out, the plain language of the contract negotiated between the parties suggests that they intended to guarantee Winder a one-year term. A contract that specifies a duration of time is not a contract for at-will employment. *See, e.g.*, *Reaves-Bey v. Karr*, 840 A.2d 701, 704 (D.C. 2004) ("Absent 'expression of a specific term of duration' in an employment relationship, there is a presumption that the employment is 'terminable at will by any party at any time.'"); *see also* 19 WILLISTON ON CONTRACTS § 54:39 (4th ed. 1993) ("There are two basic forms of employment: employment for a definite or ascertainable term and employment at will.").

Because Winder's employment classification is muddled at best, there is a genuine question whether DCPS could terminate him when it did. With that issue in dispute, the district court lacked a basis to grant summary judgment against Winder's claims that he was fired prematurely and that his procedural due process rights were violated.

**D.**

Finally, we decide whether the district court properly disposed of Winder's remaining contract claims.

As explained above, the district court initially ruled that many of Winder's claims, including those for breach of contract, were preempted by the CMPA. At Winder's request, the court later reinstated the claim for breach of the written contract discussed in Part II.C, *supra*, after the District agency charged with administering the CMPA ruled that he was not covered by that statute. Winder argues that the court erred by refusing to reinstate his "claims of breach of oral contract." Appellant's Br. at 28. But Winder never asserted such a claim. He relies on Count VII of the amended complaint but never asked the district court to reinstate Count VII. He sought reinstatement only of Count IX, which only alleged breach of the written contract. *See* Plaintiff's Motion for Reconsideration at 2, *Winder*, No. 03-2623 (D.D.C. Nov. 15, 2006) ("This motion seeks reconsideration only of the portions of the . . . Orders dismissing the claims for breach of written employment contract."); *id.* at 7 ("[W]e request the court to reinstate Winder's contract claims in Count IX."). Having failed to request reinstatement of Count VII, Winder cannot challenge its dismissal on appeal. *See Trout v. Sec'y of Navy*, 540 F.3d 442, 448 (D.C. Cir. 2008) (arguments not raised before the district court are waived). Even if his argument were properly raised, Count VII does not contain a claim for breach of oral contract. Although that claim is labeled "Breach of contract and tortious interference," its allegations refer only to his written contract (and are duplicative of the written contract claim in Count IX) or relate to tortious interference. *See* J.A. at 139. Winder cannot ground his new arguments about oral contract on Count VII.

Winder next argues that the district court improperly granted summary judgment on his contract claim for compensatory time. Before the district court, Winder argued that he was entitled to payment for compensatory time he accumulated prior to and under the 2002 contract. His claim

was based on an alleged pre-2002 oral promise from a DCPS official, which Winder argued had become part of the 2002 contract. On appeal, however, Winder no longer relies on the written contract to support his claim for compensatory time. Instead he argues that the District's failure to pay for this time is a breach of the alleged oral contract. But again, Winder has waived any claim for breach of oral contract by not raising it before the district court, either in the complaint or in the motion for reconsideration.

Finally, Winder argues that the district court should not have granted summary judgment against his claim for pension benefits. The 2002 contract entitled Winder to "an employer paid pension benefit plan with a contribution by DCPS of 7% of total compensation." J.A. at 111. The District initially agreed that Winder's benefits had vested and directed him to apply for a refund. But in its summary judgment reply brief, the District changed positions, explaining that its regulations and federal law imposed a minimum five-year vesting period. Because Winder had not worked for the District for five years, the court denied his pension benefits claim. Winder does not dispute that, under federal law, a pension plan such as the District's must impose either a five-year minimum vesting period before an employee has a right to 100% of employer contributions or an alternative, graduated vesting plan. *See* 26 U.S.C. § 411(a)(2)(A)(i) (2006). Nor does he dispute that the District has chosen to comply with this requirement by using the five-year, 100% vesting period. *See* D.C. MUN. REGS. tit. 6, §§ 2602.3, 2605.10, 2606.1. Instead he claims, without offering support, that these regulations do not apply to him. But even if Winder could show that he was within one of the exceptions to the regulations, federal law also requires a five-year vesting period. The district court was bound to apply that law regardless of the District's initial oversight.

**III.**

Because there is a genuine issue whether DCPS could fire Winder before the expiration of the one-year term specified in his employment contract, we reverse the district court's summary judgment on the premature termination and procedural due process claims and remand for further proceedings. We affirm the district court in all other respects.

*So ordered.*