# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 14, 2013        Decided July 15, 2014

No. 12-7129

BRUNO K. MPOY,
APPELLANT

v.

MICHELLE RHEE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cv-01140)

*Jason D. Moore* argued the cause for appellant. With him on the brief were *Stewart S. Manela* and *Rachel M. Witriol*.

*Richard S. Love*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for Donald Presswood. With him on the brief were *Irvin B. Nathan*, Attorney General, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General at the time the brief was filed.

*William L. Drake* argued the cause and filed the brief for appellee Michelle Rhee.

Before: GARLAND, *Chief Judge*, and HENDERSON and SRINIVASAN, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GARLAND.

GARLAND, *Chief Judge*: Bruno Mpoy, a former District of Columbia special education teacher, alleges that his school principal and the chancellor of the District of Columbia Public Schools terminated him because of an email he sent to the chancellor. Mpoy contends that one sentence in that email constituted speech protected by the First Amendment, and that his termination therefore violated the Constitution. The district court determined that the email did not constitute protected speech, and that even if it did, the individual defendants were entitled to qualified immunity. We affirm the judgment on the latter ground.

I

The district court granted the defendants' motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). We review such a judgment de novo, taking the complaint's factual allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Taylor v. Reilly*, 685 F.3d 1110, 1113 (D.C. Cir. 2012); *Stewart v. Evans*, 275 F.3d 1126, 1132 (D.C. Cir. 2002). The facts, as alleged in the complaint, are as follows.

In 2007, the District of Columbia Public Schools (DCPS) hired Mpoy as a special education teacher at Ludlow Taylor Elementary School on a probationary basis. Mpoy came to DCPS through DC Teaching Fellows and The New Teacher Project. Under those programs, he was granted a provisional teaching license, with the expectation that he would receive full

licensing upon completion of his teaching certification classes at George Washington University.

According to the complaint, Mpoy faced challenges in his role as a special education teacher from the very beginning. His classroom was dirty and lacked books and other necessary materials. Compl. ¶¶ 39-40. He complained to the principal, Donald Presswood, who ignored his complaints. After Presswood observed Mpoy's classroom and teaching performance, Mpoy requested feedback but never received any. *Id.* ¶¶ 40, 43-45.

The school gave Mpoy teaching assistants, who were supposed to help him carry out his teaching duties and foster a positive learning experience. But "[f]rom the moment [Mpoy] began teaching at Ludlow, his teaching assistants were hostile, unprofessional, and unwilling to assist [Mpoy's] effort to educate and nurture his special education students." Compl. ¶ 47. The "disruptive and hostile acts of [the teaching assistants] included . . . failing to follow [Mpoy's] lesson plans, provoking students to fight, inciting [Mpoy's] students to be disrespectful to one another, encouraging students to be disrespectful to [Mpoy], reading and showing entirely non-educational materials to students, dressing unprofessionally and inappropriately, and taking students for unscheduled recess without [Mpoy's] permission." *Id.* ¶ 48. Mpoy repeatedly informed Presswood of this conduct "that was hindering [Mpoy's] ability to teach his special education students." *Id.* ¶ 51. Presswood generally ignored Mpoy's complaints, failed to take any corrective action, and accused Mpoy of creating the problems. *Id.* ¶¶ 52-53.

DCPS evaluates the progress of special education students using the "DC-CAS Alternative." Compl. ¶ 65. The DC-CAS Alternative requires the teacher to assess a student's knowledge

at intervals during the year. According to the complaint, Presswood instructed Mpoy to falsify the assessments of his special education students to make it appear that they had demonstrated acceptable progress. *Id.* ¶ 70. When Mpoy told Presswood that he would not do it, *id.* ¶ 71, Presswood enlisted two other teachers "to falsify the records of Plaintiff's special education students," *id.* ¶ 72.

In January 2008, Presswood issued a letter of warning to Mpoy, accusing him of excessive tardiness and failing to follow lesson plans. Compl. ¶ 80. Despite Mpoy's request for an explanation, Presswood never provided one. *Id.* In February 2008, Presswood issued another warning letter, accusing Mpoy of failing to monitor and escort his students and failing to follow fire drill procedures. Mpoy again requested an explanation, and Presswood again failed to provide one. *Id.* ¶ 81. On May 7, 2008, at Presswood's recommendation, Mpoy was issued a five-day suspension for failure "to follow instructions issued by your supervisor to conduct a classroom observation." *Id.* ¶¶ 82-83. After receiving his notice of suspension, Mpoy asked to see his personnel file; his request was denied. *Id.* ¶ 84.

On June 2, 2008, Mpoy sent then-Chancellor Michelle Rhee the email that is at the heart of this appeal. The email described in detail Presswood's actions and the various classroom problems that Mpoy had brought to Presswood's attention but that the principal had failed to remedy. Compl. ¶ 86. The five-page email included a one-sentence reference to Presswood's alleged direction to falsify the records of Mpoy's students. *See* Email from Bruno K. Mpoy to Michelle Rhee (June 2, 2008), J.A. 52-56.

On June 4, 2008, Presswood called Mpoy into his office for a meeting. During the meeting, Presswood said he would recommend to Rhee that Mpoy's teaching position not be

renewed; he gave no reason for that recommendation. Compl. ¶¶ 87-88. On June 13, Presswood issued Mpoy's evaluation for the previous year. It stated that he was either ineffective or needed improvement in every area, an evaluation that Mpoy alleges was baseless. *Id.* ¶¶ 90-91. On July 9, Mpoy met with officials in the chancellor's office, where he was told that Presswood had recommended nonrenewal of his teaching position and that he would be receiving a termination letter. *Id.* ¶¶ 94-97. When Mpoy arrived for work on August 19, 2008, he was given a termination letter dated July 15, 2008. *Id.* ¶¶ 99-101.

The following year, Mpoy sued The New Teacher Project, the District of Columbia, Presswood, and Rhee, contending (inter alia) that he was fired "for reporting the misconduct and inappropriate conditions he encountered at Ludlow." Compl. ¶ 13. The complaint, filed in United States District Court, stated a federal claim under 42 U.S.C. § 1983 for retaliation in violation of the First Amendment, as well as several non-federal claims, including breach of contract and violation of the D.C. Whistleblower and Human Rights Acts. On July 2, 2012, the district court granted The New Teacher Project's motion to dismiss. The court permitted the First Amendment retaliation claim to proceed, but only against Rhee and Presswood, and only in their personal capacities. Mpoy has not appealed that ruling.

Rhee, Presswood, and the District of Columbia subsequently moved for judgment on the pleadings, which the district court granted in November 2012. *Mpoy v. Fenty*, 901 F. Supp. 2d 144, 153-57 (D.D.C. 2012). The court held that Mpoy's speech was not protected by the First Amendment because it was made pursuant to his official duties rather than as a citizen on a matter of public concern. In the alternative, the court held that, even if the speech were protected, Presswood

and Rhee were entitled to qualified immunity. Having dismissed the federal claims, the court declined to exercise supplemental jurisdiction over Mpoy's non-federal claims, saying that he could refile them in the appropriate local court. Thereafter, Mpoy filed the instant appeal, which challenges only the dismissal of his First Amendment retaliation claim for damages against Rhee and Presswood in their personal capacities.

II

It is well established that teachers -- and other government employees -- do not "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968). Instead, First Amendment protection of a teacher's speech depends upon "a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

A

In *Garcetti v. Ceballos*, the Supreme Court articulated a two-step inquiry to determine whether the speech of a public employee is protected under the First Amendment:

> The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had

an adequate justification for treating the employee differently from any other member of the general public.

547 U.S. 410, 418 (2006) (citations omitted).  Both steps "are questions of law for the court to resolve." *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007); *see Connick v. Myers*, 461 U.S. 138, 148 n.7 (1983).  The first step is comprised of two requirements:  for the speech to be protected, the employee must have spoken (1) as a citizen, and (2) on a matter of public concern.  *See Bowie v. Maddox*, 642 F.3d 1122, 1133-34 (D.C. Cir. 2011); *see also Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 201 (2d Cir. 2010); *Davis v. McKinney*, 518 F.3d 304, 312 (5th Cir. 2008) (noting that *Garcetti* added a "threshold layer" that focused first on the "role the speaker occupied" before focusing on "the content of the speech").

The first requirement -- that the employee spoke as a citizen rather than an employee -- is the focus of this appeal.  As to that requirement, *Garcetti* said:  "We hold that when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline."  547 U.S. at 421.  In *Garcetti*, the Court held that an internal memorandum written by a deputy district attorney "pursuant to [his] duties" did not constitute speech as a citizen and hence was unprotected.  *Id.* at 421-22.

Because the plaintiff in *Garcetti* conceded that his statements were made "pursuant to his employment duties," *id.* at 424, the Court had no occasion to comprehensively articulate what is encompassed by that phrase, other than to observe:

> The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Id.* at 424-25. In the years since *Garcetti*, this circuit has had several occasions to consider the meaning of "pursuant to . . . official duties." In 2007, in *Wilburn v. Robinson*, we considered whether allegations made by the director of the D.C. Office of Human Rights -- that the District had unlawfully discriminated in refusing to authorize salaries she had requested -- constituted protected speech. 480 F.3d at 1150. Relying on *Garcetti*, we held that her speech had been made pursuant to her official duties and was thus unprotected. *Id.* at 1151. In 2008, in *Thompson v. District of Columbia*, we held that the chief of security for the D.C. Lottery Board was speaking pursuant to his official duties when he reported financial misconduct to Lottery Board officials. 530 F.3d 914, 918 (D.C. Cir. 2008).

In 2009, in *Winder v. Erste*, we summarized the then-state of our case law regarding the meaning of "pursuant to . . . official duties" as follows: "In our cases applying *Garcetti*, we have consistently held that a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command." 566 F.3d 209, 215 (D.C. Cir. 2009) (citing, inter alia, *Thompson* and *Wilburn*). In *Winder*, we held that DCPS' transportation manager was not entitled to First Amendment protection for "his testimony before the D.C. Council, his reports to the . . . Special Master, and his complaint to the D.C. Inspector General." *Id.* at 214. "Speech

can be covered by the First Amendment," we acknowledged, "even if it is related to one's job function." *Id.* at 216. The transportation manager's speech, however, was made "pursuant to his official duties" because it did not merely "concern[]" those duties but rather "attempt[ed] to implement" them. *Id.* at 216 (internal quotation marks omitted). Subsequently, in 2011, we held that an affidavit drafted by an official in the D.C. Office of the Inspector General likewise fell within his official duties under *Garcetti*. *Bowie*, 642 F.3d at 1134.

B

According to Mpoy's complaint, he was fired "for reporting the misconduct and inappropriate conditions he encountered at Ludlow." Compl. ¶ 13. In his briefs and argument, Mpoy made clear that his claim is that the speech that caused him to be fired was the email he sent to Chancellor Rhee. *See* Mpoy Br. 15, 22-25; Oral Arg. Recording at 9:13.[1] Under circuit law as described in *Winder*, however, that email is unprotected by the First Amendment because it "report[ed] conduct that interfere[d] with his job responsibilities." 566 F.3d at 215.

---

[1]Although the email was not attached to the complaint, the District Court considered it under Rule 12(c) because it was incorporated into the complaint by reference. *Mpoy*, 901 F. Supp. 2d at 154 n.1; *see EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997) ("In determining whether a complaint fails to state a claim, we may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice."); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-47 (2d Cir. 1991); *Fudge v. Penthouse Int'l, Ltd.*, 840 F.2d 1012, 1014-15 (1st Cir. 1988). Mpoy did not and does not object to consideration of the email. *See* Mpoy Br. 22 n.2.

Both the content and the context of the email, as construed in light of the complaint, indicate that Mpoy was speaking as an employee reporting conduct that interfered with his job responsibilities, rather than as a citizen. The opening two sentences of the email stated: "I am a special education teacher at Ludlow Taylor ES. As a teacher, my primary duty is to ensure student achievement." Mpoy Email, J.A. 52. It then went on to list a litany of complaints indicating that the school, and particularly its principal, had been interfering with that "primary duty."

The majority of the email's complaints related to the misbehavior of Mpoy's teaching assistants. His assistants, Mpoy charged, were "engaged in a campaign to disrupt the educational process." *Id.*; *id.* at J.A. 55 (same). Several paragraphs were devoted to describing that behavior. *See id.* at J.A. 54. Among other things, the email alleged that one of the assistants "slept in the classroom, . . . physically engaged a female student, ate in the classroom, paraded in and out of the classroom, and incited students. In addition, he wore shorts and untied basketball shoes to school and was generally unkempt; he had visible dirt in his finger nails." *Id.* The email further complained that the assistants' "campaign to disrupt the educational process" included:

> showing non-educational movies such as Cinderella during instructional time; taking students outside from the cafeteria after lunch for a second recess during instructional time; playing non-educational games with students during instructional time; rewarding students with treats for not completing their assignments[;] . . . inciting students to disrupt the educational process, inducing students to lie, holding loud personal conversations during instructional time; allowing the cell phone to ring to rap music which students sing

> when the cell phone rings; making loud, argumentative statements to the teacher in the presence of students; refusing to implement the curriculum based lessons I provide, and instead, giving students non-curriculum based, mindless tasks . . . ; destroying all established routines and procedures by condoning and/or passively encouraging students not to follow classroom rules.

*Id.* at J.A. 55-56.

The email also decried Presswood's failure to stop the misbehavior of Mpoy's teaching assistants. *Id.* at J.A. 52. Although he "apprised Dr. Presswood of the [assistants'] conduct with more than twenty emails," Mpoy wrote Rhee, Presswood "failed to respond to any of them or take action of any kind." *Id.* at J.A. 52-53. Several paragraphs of Mpoy's email to Rhee were devoted to detailing the ways in which Mpoy had unsuccessfully sought to correct the teaching assistant problem "because I could not teach and the students were no[t] learning," *Id.* at J.A. 54; *see id.* at J.A. 54-56. Apparently to discourage such disruption, Mpoy told Rhee that he had "asked Presswood to grant me permission to request consent from parents for me to install a video camera in my classroom," but that "he never responded." Mpoy also said that he had warned Presswood "that if the [assistants] continued to disrupt the educational process, I would write directly to Chancellor Rhee and request permission to install a video camera in my classroom." *Id.* at J.A. 53. Notwithstanding the threat, Presswood still "did not take any action." *Id.*

The email listed other complaints as well. It devoted an entire paragraph to Mpoy's contention that he had been "suspended without pay and without due process." *Id.* at J.A. 52. It reported that, "to date," he still did "not have all the books" needed to teach his students, and that Presswood had

"refused to provide [them]." *Id.* at J.A. 53-54. And it advised Rhee that he had "asked Dr. Presswood to fix the classroom clock," but that he had "not taken any action." *Id.* at J.A. 56.

Mpoy does not dispute that all of the speech we have described thus far was speech that Mpoy made as an employee rather than as a citizen. *See* Oral Arg. Recording at 1:09-40. But he maintains that the following sentence, also contained in the email, constituted speech as a citizen: "Dr. Presswood, the principal of Ludlow Taylor, misrepresented students' performance and results on the DCCAS Alternative." Mpoy Email, J.A. 52. According to Mpoy, that sentence was not written pursuant to his official responsibilities.

To determine whether speech "was made pursuant to official responsibilities, the Court must take a hard look at the context of the speech." *Decotiis v. Whittemore*, 635 F.3d 22, 32 (1st Cir. 2011).[2] Here, the speech in question was a single sentence consisting of 2.5 lines in a 160-line email; 16 words out of more than 1300. As we have said, Mpoy does not dispute that the vast majority of the email was government employee speech -- speech that "report[ed] conduct that interfere[d] with his job responsibilities." *Winder*, 566 F.3d at 215. Mpoy told Rhee that, "[a]s a teacher, my primary duty is to ensure student achievement," Mpoy Email, J.A. 52, and throughout the email he complained about conduct that was "disrupt[ing] the educational process" in his own classroom. *Id.* at J.A. 52, 53, 55.

---

[2] *See Abcarian v. McDonald*, 617 F.3d 931, 937 (7th Cir. 2010); *Abdur-Rahman v. Walker*, 567 F.3d 1278, 1283 (11th Cir. 2009); *see also* Mpoy Reply Br. 2 ("[T]he Court's inquiry should be a practical one, seeking clues from the context of Mr. Mpoy's speech." (citing *Garcetti*, 547 U.S. at 424)).

In this context, the sentence about the misrepresentation of the students' results was also plainly a grievance about Presswood's interference with Mpoy's duty to assess and ensure the achievement of his students. *See* Mpoy Br. 8 ("Instead of helping Mr. Mpoy educate his students, Presswood chose . . . to make it appear Ludlow was meeting its students' needs.").[3] This is further confirmed by the complaint's specific description of what Presswood had done to "misrepresent[] students' performance and results on the DCCAS Alternative." Mpoy Email, J.A. 52. The complaint makes clear that Mpoy was not complaining that the principal had changed the DC-CAS assessments of any *other* teachers' students. Rather, Mpoy specifically alleged that "Presswood instructed Plaintiff to falsify the DC-CAS Alternative assessments and other records of *his* special education students," Compl. ¶ 70 (emphasis added), and that when Mpoy refused, "Presswood enlisted two other teachers at Ludlow to falsify the records of *Plaintiff's* special education students," *id.* ¶ 72 (emphasis added). In his brief, Mpoy makes the same allegations and describes them in the same way. *See* Mpoy Br. 7 (stating that "Presswood instructed Mpoy to fabricate acceptable performance results" for his students, and that when he refused, "Presswood enlisted two other teachers to . . . conduct[] sham assessments of *Mr. Mpoy's* students" (emphasis added)).[4] In context, then, Presswood's

---

[3] *See also* Compl. ¶ 66 (stating that it is the responsibility of the teacher to "assess[] a student to determine the student's beginning level of knowledge" and that, "[b]ased on the first assessment, the teacher educates the student to improve knowledge level").

[4] At oral argument, counsel acknowledged that the only misrepresentations Mpoy knew of at the time he sent the email -- and the only allegation he made in the complaint -- concerned his own students' assessments. Oral Arg. Recording at 7:17-8:26. Counsel did contend that he might have learned of a "grander campaign" if the district court had not dismissed the complaint and instead allowed him

complaint to Rhee on this subject was made "pursuant to his official duties." *Cf. Adams v. N.Y. State Educ. Dep't*, 752 F. Supp. 2d 420, 429-30 (S.D.N.Y. 2010) (holding that a teacher's complaint to school authorities that her principal had instructed her to make improper changes in her own students' grades was unprotected because it was made pursuant to her official duties), *aff'd sub nom. Ebewo v. Fairman*, 460 F. App'x 67 (2d Cir. 2012).

Mpoy argues, to the contrary, that the context of the statement suggests he was speaking as a citizen rather than an employee because he sent the email outside the "chain of command" -- by sending it directly to Chancellor Rhee rather than to his principal's immediate superiors. As noted above, we held in *Winder* that "a public employee speaks without First Amendment protection when he reports conduct that interferes with his job responsibilities, even if the report is made outside his chain of command." 566 F.3d at 215. But granting that whether speech is made inside or outside a chain of command may be a contextual factor in determining *whether* the employee made it to report interference with his job responsibilities,[5] there is little doubt that Mpoy was using the email to Rhee as an internal channel through which he could, in his capacity as a teacher, report such interference. Mpoy identified himself by his job title in both the opening paragraph and the closing

to take discovery. *Id*. But such discovery could not have been relevant to determining how to characterize what Mpoy was reporting in an email that he sent before he filed suit.

[5]*See Decotiis*, 635 F.3d at 32; *Weintraub*, 593 F.3d at 204; *Davis*, 518 F.3d at 313 & n.3; *Thompson*, 530 F.3d at 916-17. *Garcetti* made clear that the fact that an employee "expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work." 547 U.S. at 420.

signature.[6]  *See Bowie*, 642 F.3d at 1134.  And he does not dispute that more than 98% of the email served no purpose other than reporting interference with his ability to educate his students.  *See* Oral Arg. Recording at 1:09-40.  Indeed, Mpoy's email advised Rhee that he had warned Presswood he would "write directly to Chancellor Rhee" if Presswood failed to take action to stop the disruption in his classroom, clearly indicating that he thought direct contact with her was a way to report classroom problems.  J.A. 53.

Accordingly, we conclude that, under the *Winder* test, Mpoy's email constituted employee speech unprotected by the First Amendment.

C

*Winder*, however, is not the last word on this subject.  In June of this year, the Supreme Court decided *Lane v. Franks*, in which it held that the First Amendment "protects a public employee who provided truthful sworn testimony, compelled by subpoena," at least where testifying was outside the scope of the employee's "ordinary job responsibilities."  __ U.S. __, __, No. 13-483, 2014 WL 2765285, at *3 (June 19, 2014); *see id.* at *5, *7 n.4 (2014).  In so holding, the Court focused particularly on the nature of compelled testimony.  *See id.* at *8.  Moreover, because it was "undisputed that Lane's ordinary job responsibilities did not include testifying in court proceedings," *id.* at *7 n.4, the Court, as in *Garcetti*, had no occasion to consider how the scope of such responsibilities should be determined in other circumstances.  As a consequence, *Lane*

---

[6]*See* Mpoy Email, J.A. 52 ("I am a special education teacher at Ludlow Taylor ES."); *id.* at J.A. 56 ("Sincerely, Bruno K. Mpoy, Special Education Teacher, Ludlow Taylor ES").

does not directly or necessarily contradict *Winder*'s application of *Garcetti*.[7]

Nonetheless, it is possible that *Winder*'s broad language, interpreting *Garcetti* as leaving an employee unprotected when he reports conduct that "interferes with his job responsibilities," 566 F.3d at 215, could be in tension with *Lane*'s holding that an employee's speech is unprotected only when it is within the scope of the employee's "ordinary job responsibilities," 2014 WL 2765285, at *8, or "ordinary job duties," *id.* at *7.[8] In particular, the use of the adjective "ordinary" -- which the court repeated nine times -- could signal a narrowing of the realm of employee speech left unprotected by *Garcetti*. Neither *Garcetti* nor any other previous Supreme Court case had added "ordinary" as a qualifier.[9]

---

[7]In *Winder*, we said that, although employee "testimony before a city council might otherwise be just the sort of citizen speech protected by the First Amendment," Winder's testimony was different (and unprotected) because it was given "pursuant to his duty to implement [specific court] orders." 566 F.3d at 215. *Lane* expressly declined to address "whether truthful sworn testimony would constitute citizen speech under *Garcetti* when given as part of a public employee's ordinary job duties." 2014 WL 2765285, at *7 n.4.

[8]*Lane* also said that the critical question is not whether the speech "merely concerns" an employee's duties. 2014 WL 2765285, at *8. This is in accord with *Winder*, which likewise said that speech is not unprotected merely because it "'concerns' an employee's job duties." 566 F.3d at 216.

[9]*Garcetti* did use the word in quoting a lower court opinion in that case, *see* 547 U.S. at 416, and Justice Breyer used it in his dissent, *see id.* at 444 (Breyer, J., dissenting).

But we need not resolve that question today.  As the Court noted in *Lane* -- and went on to hold in that case -- even if speech is protected by the First Amendment, a court must dismiss claims against a government official in his personal capacity if the official is entitled to qualified immunity.  2014 WL 2765285, at *10.  "Under [qualified immunity] doctrine, courts may not award damages against a government official in his personal capacity unless 'the official violated a statutory or constitutional right,' and 'the right was "clearly established" at the time of the challenged conduct.'"  *Id.* (quoting *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011)).  "The relevant question for qualified immunity purposes," the Court said, is whether the official could "reasonably have believed, at the time he fired [the plaintiff], that a government employer could fire an employee on account of" the speech in question.  *Id.*  In *Lane*, the Court found that precedent in the Eleventh Circuit, in which the case was brought, "did not preclude [the defendant] from reasonably holding that belief.  And no decision of this Court was sufficiently clear to cast doubt on the controlling Eleventh Circuit precedent."  *Id.*

As we held in Part II.B, under this circuit's *Winder* test, Mpoy's email constituted unprotected employee speech.  (And no Supreme Court case at the time "cast doubt" on that precedent.)  A fortiori, the defendants could reasonably have believed that they could fire Mpoy on account of that email.[10]  Indeed, even if we are wrong in concluding as a matter of law that the email "report[ed] conduct that interfere[d] with his job responsibilities," *Winder*, 566 F.3d at 215, it surely would not

---

[10]This assumes, of course, that the defendants did fire Mpoy on account of the email -- an assumption we are required to make because the district court dismissed the case under Rule 12(c).  *See Iqbal*, 556 U.S. at 678-79.

have been unreasonable for the defendants to believe that it did, and hence that it was lawful to fire Mpoy under *Winder*.

There is one further wrinkle to consider. The question under the qualified immunity doctrine is whether the official violated a right that was "clearly established at the time of the challenged conduct," and thus whether the defendants "could reasonably have believed, at the time [they] fired" Mpoy that his speech was unprotected. *Lane*, 2014 WL 2765285, at *10. *Winder* was decided approximately a year after the defendants fired Mpoy, and hence could not itself have been the basis for reasonable belief on the part of the defendants. But *Winder* said that the test it was articulating was the consistent holding of "our cases applying *Garcetti*," 566 F.3d at 215, and all of the cases *Winder* cited were decided before Mpoy was fired. Accordingly, because this court read its preexisting law as yielding the test we announced in *Winder*, it could not have been unreasonable for the defendants to do so as well. Presswood and Rhee are therefore entitled to qualified immunity.

## III

For the foregoing reasons, we conclude that the defendants are entitled to qualified immunity on Mpoy's First Amendment claim. Whether Mpoy may obtain relief on his other, non-federal claims is a question that is not before us, as Mpoy has not appealed the district court's decision declining to exercise supplemental jurisdiction over those claims. Accordingly, the judgment of the district court is

*Affirmed.*