MARTIN, Circuit Judge,
dissenting:
The Majority concludes that several psychologists who work in Georgia State University’s Counseling and Testing Center (“Center”) were speaking as employees, rather than citizens, when they criticized the practices of that Center’s Director. The Majority also holds- that these criticisms are not a matter of public concern. I believe the First Amendment affords more protection to public employees than the Majority opinion allows, and I would reverse the District Court’s grant of summary judgment to the University. It is for that reason I respectfully dissent.
The Supreme Court regularly reminds us that “public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee’s right, in certain circumstances, to speak as a citizen addressing matters of public concern.” Garcetti v. Ceballos, 547 U.S. 410, 417, 126 S.Ct. 1951, 1957, 164 L.Ed.2d 689 (2006). For example in Lane v. Franks, — U.S. -, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014), the Supreme Court, reaffirmed that “speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment.” Id. at 2379. Given this “special value,” Lane indicates that we should exercise care in applying Garcetti’s exception to First Amendment protection.
In exercising this care, we ask two questions: first, whether the psychologists spoke as citizens;. and second, whether their speech implicated a matter of public concern. Moss v. City of Pembroke Pines, 782 F.3d 613, 617 (11th Cir.2015). And as we always do in reviewing the grant of summary judgment, we “construe the facts and draw all inferences in the light most favorable to the nonmoving party.” Feliciano v. City of Miami Beach, 707 F.3d 1244, 1252 (11th Cir.2013) (quotation omitted). The District Court and the Majority answer “no” to both questions. My answer is “yes” to both, so I write to explain how I part ways with my colleagues.
I.
Als I said, in order to receive First Amendment protection, the psychologists *1169 must first have spoken as citizens rather than employees. The Supreme Court recently gave us guidance about how to answer this question. In Lane v. Franks, our Circuit held that Mr. Lane’s sworn testimony was employee speech because he “learned of the subject matter of his testimony in the course of his employment.” 134 S.Ct. at 2379. We were wrong.[1] In reversing the judgment of this Court, the Supreme Court told us that “the mere fact that a citizen’s speech concerns information acquired by virtue of his public employment does not transform that speech into employee — rather than citizen — speech.” Id. Rather, “[t]he critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee’s duties, not whether it merely concerns those duties.” Id. (emphasis added).[2]
The Majority is, of course, correct when it says that after Lane, Garcetti’s exception to First Amendment protection must be construed narrowly to encompass only “speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment.” But I do not see that the Majority applies its own enunciation of the rule. Instead, the Majority broadly reasons that an employee is unprotected when she speaks about conduct that in some way interferes with her ordinary job responsibilities. But this does not give sufficient weight to Lane’s clarification of our First Amendment precedent.
It is clear to me that the psychologists’ speech was not “ordinarily within the scope of [their] duties.” Id. As set forth in the Magistrate Judge’s Report and Recommendation, their duties included “providing counseling services to the GSU population, conducting mandatory risk assessments of students of concern, and supervising and training the individuals within the [Center’s] training and practicum programs.” According to their sworn declarations, the psychologists were not responsible for critiquing or assessing the Center Director’s performance and its impact on student mental health or the functioning of the Center. For instance, while Corey M. Arranz was the Center’s Crisis Response Coordinator overseeing crisis services, he “was not charged with ultimate oversight of the [Center’s] programs, ... operations of the [Center] ... [or] supervision, evaluation, critique, appraisal or reporting as to the performance of. the director.” Likewise, Melissa A. Alves noted that while she was responsible for therapy and consultations, as well as educational instruction and service on committees, she was not “ultimately responsible for operations at the [Center],” nor was she “responsible for supervision, evaluation, critique, appraisal or reporting as to the performance of the director.” So too with the remaining Appellants— Sandrine M. Bosshardt, Kensa Gunter, and Alayeia Reid.[3]
*1170 No one really disputes that the psychologists had only limited supervisory duties. Nevertheless, the Majority suggests that even this limited supervisory role brings the psychologists’ criticism of the Director’s performance within their ordinary job responsibilities. But as nonmoving parties, the psychologists are entitled to have “[a]ll reasonable inferences arising from the undisputed facts” drawn in their favor. Ave. CLO Fund, Ltd. v. Bank of Am., N.A., 723 F.3d 1287, 1294 (11th Cir.2013) (quotation omitted). The Majority’s emphasis on its own view of the Appellants’ supervisory roles is not therefore proper at the summary judgment stage.
I certainly recognize that parts of the Memorandum' touched on the psychologists’ job duties. The Memorandum asserts, for example, that “Dr. Lee-Barber’s lack of knowledge in the areas of complex psychopathology and ineffectiveness in dealing with campus collaborators, and her inability to advocate for the appropriate use of psychologists’ skills in conducting [mandatory student risk] assessments significantly compromises the [Center’s] ability to effectively manage risk and crisis.” The Memorandum also notes the Director’s detrimental effect on the “[Center’s] ability to attract, recruit, and retain trainees ... [which] directly impacts the quantity and quality of service provision at the [Center].” The psychologists do not contest that counseling, risk assessment, and trainee recruitment were part of their ordinary responsibilities.
However, Lane tells us that the First Amendment protects the speech an employee makes outside of her ordinary obligations, even if it touches on those obligations. Public employees “are uniquely qualified to comment” on issues of public concern because of the knowledge they gain through their ordinary work responsibilities. Lane, 134 S.Ct. at 2380 (quotation omitted). Here, the psychologists spoke of their own duties only in the context of raising broader concerns about the effects of the Director’s mismanagement. Specifically, the psychologists said that the Director’s practices impeded their ability to identify students who might be a risk to themselves or others and to provide effective counseling services. I do not view these health and safety concerns as merely personal gripes or employment-related grievances. See Cook v. Gwinnett Cty. Sch. Dist., 414 F.3d 1313, 1319 (11th Cir.2005) (holding that a bus driver’s concerns about “the safety of children due to bus overcrowding and the lack of time allotted for pre-trip bus inspections” were not merely “internal bus driver employment issues”); see also Peterson v. Atlanta Hous. Auth., 998 F.2d 904, 917 n. 25 (11th Cir.1993) (“Some issues may be obviously of public concern from their subject matter, for instance, an alleged health or safety risk.”). In contrast, the Majority concludes that the Appellants’ ordinary duties included the obligation to make these criticisms.
In support of its conclusion, the Majority cites cases I see as easily distinguishable from this one. D'Angelo v. School Board of Polk County, Florida, 497 F.3d 1203 (11th Cir.2007), for example, is a quintessential “enumerated duty” case. In DAngelo, the school principal who was denied First Amendment protection admitted that he pursued charter conversion to improve the quality of education at his school. This was one of his listed job responsibilities and indeed what he described as his “number one duty.” Id. at 1210 (quotation omitted). In contrast, our psychologists’ jobs include no duty, either express or implied, to critique higher management on the broader issues they raised.
The Majority also cites Boyce v. Andrew, 510 F.3d 1333 (11th Cir.2007) (per *1171 curiam), in which this Court held that internal complaints by social services case managers about the size of their caseloads were unprotected employee speech. Id. at 1343. In so holding, we noted that the case managers’ complaints focused on “their respective views that their caseloads were too high, which caused each not to meet expected deadlines, and their consequent need for assistance.” Id. at 1343-44. Thus, “[t]he purpose of their grievances clearly was not to raise public awareness about children within the care of [their office].” Id. at 1346. Here, in contrast, the psychologists complained not about a routine aspect of their daily work, but about broader mismanagement and dysfunction at the Center. In doing so, they spoke directly to the quality of services the Center offered to the University and its students.
The Majority also says that the psychologists spoke as employees because they reported conduct that related to their ability to fulfill their respective responsibilities. This argument treads too closely to that affirmatively rejected by Lane. The Supreme Court repeats the modifier “ordinary” nine times in the Lane opinion, emphasizing that an employee loses First Amendment protection only as to speech he undertakes in “performing] the tasks he was paid to perform.” 134 S.Ct. at 2379 (quoting Garcetti, 547 U.S. at 422, 126 S.Ct. at 1960).[4] Lane’s holding strengthens Garcetti’s “significant point” that First Amendment protection should only be withheld from speech “commissioned or created” by the employer. Garcetti, 547 U.S. at 421-422, 126 S.Ct. at 1960. To say, as the Majority does, that the psychologists spoke as employees because “each complaint or concern relates back to Appellants’ ordinary duties,” seems to me to deny protection based on “the mere fact that [the psychologists’] speech concerns information acquired by virtue of [their] public employment.” Lane, 134 S.Ct. at 2379.[5] Binding Supreme Court precedent forbids this.
Although the Majority acknowledges Lane’s import to some degree, it does not apply its rule. I read the Memorandum to address matters beyond the scope of the ordinary job duties of its writers, so I would hold that the psychologists spoke as citizens rather than employees.
II.
The Majority also holds that the Memorandum does not implicate a matter of public concern. Speech involves matters of public concern when it can be “fairly considered as relating to any matter of political, social, or other concern to the community.” Connick v. Myers, 461 U.S. *1172 138, 146, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983). To decide whether speech is a matter of public concern, we look at “the content, form, and context of a given statement, as revealed by the whole record.” Id. at 147-48, 103 S.Ct. at 1690.
In Peterson, we found guidance in “a critical word in the Supreme Court’s articulation of the standard, that is the word ‘fairly.’ ” 998 F.2d at 916 (quoting Connick, 461 U.S. at 146, 103 S.Ct. at 1690). We explained that:
the Supreme Court did not say that an employee’s speech must be “definitively” or “clearly” or “indisputably” characterized as a matter of public concern.... If it is capable of being fairly so characterized, then dismissal on summary judgment without examination of the evidence supporting the claim is inappropriate.
Id. The Majority acknowledges that “the question of what constitutes proper care in the treatment of mental health issues is a matter worthy of a public forum.” Nevertheless, the Majority holds that the “main thrust” of the psychologists’ speech was voicing private grievances against the Director. But- given that they also advanced health and safety issues that can be “fairly” considered matters of public concern, summary judgment was not properly entered against them.
No doubt some of the problems set out in the Memorandum relate to the impact the Director’s conduct had on how the psychologists carried out their job duties. However, we have held that if employee speech “contained some matters of public interest in addition to ... personal attacks, the personal nature of the speech would not, standing alone, be sufficient to render the speech private.” Mitchell v. Hillsborough Cty., 468 F.3d 1276, 1285 n. 22 (11th Cir.2006) (emphasis added). On this record, I believe there is a “sufficient quantum of content touching a matter of public concern” to support the Appellants’ First Amendment claim. Id.
The University recognized at oral argument that the Memorandum contained “some matters of concern.” For example, early in the Memorandum, the psychologists emphasize that the Director’s conduct has caused “an adverse impact on client care and has jeopardized the reputation of the Center both in the GSU community and with community collaborators.” The Memorandum also mentions that these failings “jeopardize the programs, contribute to and cause waste of resources and capital, risk the safety and well-being of students served by the programs and threaten the integrity of the administrative and extra-judicial processes inherent in our governance.”
The enumerated grievances also connect the Director’s conduct to the quality of services the Center provides. In the section on trainee relationships, the psychologists express concern that “any rifts in our relationships or reputation [as a training center] directly impacts the quantity and quality of service provision at the [Center].” In the section on management of Center resources, they raise the concern that the Director’s lack of knowledge “directly impacts the development of policies and procedures necessary to create an effective system by which to meet the service demands of the students and the University community.” Even though the psychologists do reference their own grievances, they return throughout the Memorandum to the Director’s impact on the quality of mental health services delivered by the Center. Clearly, in my view, the Memorandum contains both matters of public and private concern.
In Connick, the Supreme Court confronted comparable facts. Connick presented the question of whether an Assis *1173 tant District Attorney’s questionnaire to other attorneys in the office involved matters of public concern. Id. at 140-42, 103 S.Ct. at 1686-87. Although the Supreme Court found that most of the employee’s questions were “mere extensions of [her] dispute over her transfer to another section of the criminal court,” it ruled that one question, asking whether Assistant District Attorneys felt pressure to work on political campaigns, touched upon a matter of public concern. Id. at 148, 103 S.Ct. at 1690. Despite the primarily personal nature of the questionnaire, the Supreme Court proceeded to the next part of the Pickering analysis based on that one question. Id. at 149, 103 S.Ct. at 1691.
This Court’s decision in Maples v. Martin, 858 F.2d 1546 (11th Cir.1988), is also instructive. There, we considered whether a report that included results of a survey of professors in the Mechanical Engineering Department at Auburn University involved matters of public concern. Id. at 1549. A “main concern” of the report was decidedly private in nature: “the lack of faculty involvement in administrative deci-sionmaking and the ‘morale problem’ in the Department.” Id. Indeed, “[t]he tone of the [report] was extremely critical of the Department Head.” Id. Still, this Court held that “while critical of the way the ... Department ha[d] been managed by the Department Head,” the report also touched on issues of public concern like the curriculum, facilities, and performance of graduates. Id. at 1553. In other words, it was enough that “[a]t least part of the motivation for ... publishing the [report] was to alert both the administration and other interested parties of the problems the Department was facing in providing ... students with an adequate engineering education.” Id. Our Court concluded that “the appellants were sincere in their efforts to alert the public to the conditions of [the] Department, even if that concern was co-mingled with criticism of the Department Head’s management style.” Id. I would extend the reasoning from Maples to this case and credit the psychologists with sincerely attempting to inform the public about the declining quality of health services at the.Center. I would so hold, even though their Memorandum included some complaints of a more private nature.
My conclusion is not altered by the fact that the Appellants’ Memorandum was distributed internally. As the Supreme Court tells us, the fact that an employee “expressed his views inside his office, rather than publicly, is not dispositive.” Garcetti, 547 U.S. at 420, 126 S.Ct. at 1959; see also Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 415-16, 99 S.Ct. 693, 696-97, 58 L.Ed.2d 619 (1979) (“The First Amendment forbids abridgment of the ‘freedom of speech.’ Neither the Amendment itself nor our decisions indicate that this freedom is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.”). Beyond that, the psychologists addressed the Memorandum to those at the highest levels of the University’s administration — including the Provost, the Dean of Students, and the Vice President for Student Affairs. Their concerns were not directed to the human resources department. This manner of publication also weighs in favor of treating their speech as relating to matters of public concern. After all, “[t]here is considerable value ... in encouraging, rather than inhibiting speech by public employees.” Lane, 134 S.Ct. at 2377. First Amendment principles do not require us to penalize an employee for choosing to first alert those within the University’s administration to alleged mismanagement before seeking to publicly embarrass the University.
*1174 III.
I believe these psychologists were speaking as citizens on a matter of public concern. Were my view to prevail, we would reverse and remand for the District Court to consider whether the University “had an adequate justification for treating the [psychologists] differently from any other memberfs] of the public based on the [its] needs as an employer.” Id. at 2380 (quotation omitted). If the District Court held that the psychologists’ First Amendment interests outweighed the University’s needs, the psychologists would then be entitled to have a jury consider their case that their speech was a “substantial motivating factor” in their termination. Moss, 782 F.3d at 618. Likewise, the University would have an opportunity to prove that it would have terminated the psychologists even absent their speech. Id. Maybe the psychologists would succeed before a jury — maybe not. But, at this stage in the analysis, I understand Supreme Court precedent to characterize their Memorandum as citizen speech on a matter of public concern. Therefore I respectfully dissent.

. Since I was on the panel of this court that decided Lane, I suppose another way to say it is I was wrong.

. The District Court did not mention Lane in its order denying First Amendment protection to the psychologists, and therefore seems not to have benefited from the guidance the Supreme Court gave. Perhaps the parties’ briefs did not refer to Lane because it had not been decided by the time the briefs were filed. However, Lane issued over two months before the District Court ruled and now gives us guidance for deciding this case.

.At oral argument, counsel for the University agreed that these declarations were the primary evidence in the record concerning the psychologists' job duties.

. At least two of our sister Circuits have interpreted this emphasis on "ordinary” job duties as potentially limiting the exception to First Amendment protection for employee speech even beyond what- Garcetti envisions. See Dougherty v. Sch. Dist. of Phil., 772 F.3d 979, 990 (3d Cir.2014) ("If anything, Lane may broaden Garcetti’s holding by including 'ordinary' as a modifier to the scope of an employee’s job duties.”); Mpoy v. Rhee, 758 F.3d 285, 295 (D.C.Cir.2014) (noting that the repeated use of "ordinary” may limit "the realm of employee speech left unprotected by Garcetti ”).

. The only case the Majority cites that directly holds that an employee is unprotected when he reports conduct that "interferes with his job responsibilities” is Winder v. Erste, 566 F.3d 209, 215 (D.C.Cir.2009). However, the D.C. Circuit has since called Winder into doubt, noting that "it is possible that Winder’s broad language, interpreting Garcetti as leaving an employee unprotected when he reports conduct that 'interferes with his job responsibilities,’ ... could be in tension with Lane's holding.” Mpoy, 758 F.3d at 294. In the wake of Lane and the D.C. Circuit’s own questioning of Winder's continued viability, I give this out-of-circuit precedent little weight.